**2015 UT App 172**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
BARRY J. SNYDER,
Defendant and Appellant.

Memorandum Decision
No. 20140167-CA
Filed July 9, 2015

First District Court, Logan Department
The Honorable Thomas Willmore
No. 101100501

Angela F. Fonnesbeck, Wayne K. Caldwell, and
Aaron K. Bergman, Attorneys for Appellant

Sean D. Reyes and Ryan D. Tenney, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Memorandum Decision,
in which JUDGES JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN
concurred.

ORME, Judge:

¶1    Defendant Barry J. Snyder was convicted of sexual exploitation of a minor, a second degree felony. *See* Utah Code Ann. § 76-5a-3 (LexisNexis 2008). He appeals from a subsequent order revoking his probation and imposing his suspended prison sentence of one to fifteen years. We affirm.[1]

---

1. In a decision released earlier this year, we affirmed the district court's order dismissing Defendant's petition for postconviction relief arising from this same criminal case. *See Snyder v. State*,

(continued…)

¶2     In 2010, Defendant was charged with ten counts of sexual exploitation of a minor based on the discovery of child pornography on his computer.[2] Defendant pled guilty to one count; in exchange, the State dropped the remaining nine counts. The district court suspended Defendant's prison sentence and placed him on probation for three years. The court also sentenced Defendant to one year in jail but ordered that he be transferred to the Northern Utah Community Correctional Center (NUCCC) for in-patient sex-offender treatment as soon as bed space became available. And the court ordered Defendant to complete sex-offender treatment at NUCCC and to "abide by [a particular set of] restrictions for sex offenders."

¶3     In 2011, Defendant was transferred from jail to NUCCC. In late 2011 and early 2012, Adult Probation and Parole (AP&P) filed several probation violation reports detailing Defendant's difficulties in the NUCCC program, including his failure to gain employment, his failure to attend and participate in his scheduled classes, and his continued pattern of "blam[ing] others and not himself." AP&P requested revocation and reinstatement of probation after Defendant served an additional term in jail. After a hearing, the court revoked and then reinstated probation, requiring Defendant to serve one year in jail with early release to NUCCC after 280 days, followed by

---

(…continued)

2015 UT App 37, 346 P.3d 669 (per curiam). Defendant has not, however, been without success in his appeals to this court. *See State v. Snyder*, 932 P.2d 120 (Utah Ct. App. 1997); *State v. Snyder*, 860 P.2d 351 (Utah Ct. App. 1993).

2. "In reviewing a revocation of probation, we recite the facts in the 'light most favorable to the trial court's findings.'" *State v. Legg*, 2014 UT App 80, ¶ 2, 324 P.3d 656 (quoting *State v. Jameson*, 800 P.2d 798, 804 (Utah 1990)).

thirty-six months of probation. This latest probation was explicitly categorized as "zero tolerance."

¶4 In the summer of 2013, AP&P filed another probation violation report and an affidavit in support of an order to show cause. AP&P alleged that Defendant had started a relationship with a woman, M.L., whom he had met on a dating website. When initially confronted about his relationship with M.L., Defendant told his AP&P caseworker and NUCCC staff that he had never met M.L. face to face. But after Defendant gave them access to his email account, as they requested for the purpose of verifying his story, he told them that he had met with M.L. twice in person for less than ninety minutes each time. Upon further investigation, AP&P learned that Defendant and M.L. had actually met on four occasions, sometimes for longer periods than Defendant had reported.

¶5 Based on this information, AP&P alleged that Defendant had violated his probation conditions in four ways: (1) he "failed to be truthful in all dealings" with AP&P, (2) he "dated a person with children residing at home who are under the age of 18," (3) he "failed to participate in sex offender therapy," and (4) he failed to complete the NUCCC program. As an addendum to its charging report, AP&P attached both Defendant's and M.L.'s dating website profiles and a series of emails between them. AP&P recommended that the court revoke Defendant's probation and impose his suspended prison sentence of one to fifteen years.

¶6 At a December 16, 2013 evidentiary hearing, Defendant, his AP&P caseworker, his NUCCC therapist, and M.L. testified. After hearing the testimony, the district court found that Defendant had violated the terms of his probation in three ways: (1) he was not always truthful in his dealings with AP&P, (2) he dated a woman with children under the age of eighteen residing at home, and (3) he failed to complete the NUCCC program. Based on these findings, the district court revoked Defendant's

probation and reinstated his suspended prison sentence. Defendant appeals.

¶7 "The decision to grant, modify, or revoke probation is in the discretion of the trial court." *State v. Peterson*, 869 P.2d 989, 991 (Utah Ct. App. 1994) (citation and internal quotation marks omitted). "To revoke probation, the trial court must find a violation of the probation agreement by a preponderance of the evidence." *State v. Legg*, 2014 UT App 80, ¶ 10, 324 P.3d 656. "In addition, the trial court must find, also by a preponderance of the evidence, that the violation was willful, and not merely the result of circumstances beyond the probationer's control." *Id.* (internal citations omitted). "[A] finding of willfulness merely requires a finding that the probationer did not make *bona fide* efforts to meet the conditions of his probation." *Peterson*, 869 P.2d at 991 (citation and internal quotation marks omitted). "[T]he word 'willful' should not be equated with the word 'intentional.'" *Id.* Even in routine cases, "a single violation of probation is legally sufficient to support a probation revocation." *Legg*, 2014 UT App 80, ¶ 11. And this premise is doubly true in a case where probation is expressly characterized as "zero tolerance."

¶8 We now consider Defendant's first issue on appeal. Defendant contends that there was insufficient evidence to support the district court's findings that he violated three of his probation conditions. We first consider the district court's finding that Defendant was not always truthful in his dealings with AP&P.

¶9 On July 31, 2013, NUCCC staff and Defendant's AP&P caseworker asked him about his relationship with M.L. At first, Defendant told them that "he had never met [M.L.]" and that "they had only had contact through email and phone." Defendant then gave his login information to an NUCCC supervisor, who then discovered that "there were comments from [M.L.] and [Defendant] indicating that they had met at the

Del Taco in Roy." When the supervisor confronted Defendant with the emails, Defendant conceded that he had met with M.L. two different times that month, for less than ninety minutes each.

¶10 Defendant claims that despite his initial denial and subsequent mischaracterization, he was "ultimately truthful with NUCCC and AP&P personnel." However, at the evidentiary hearing, M.L. testified that she and Defendant had met for lunch on four occasions, with one lunch lasting two-and-a-half hours, which contradicted Defendant's testimony as to the number of times he met with M.L. and the length of those visits. Despite Defendant's current effort to more charitably characterize his deception, Defendant admitted at the evidentiary hearing that he lied to his AP&P caseworker and to NUCCC personnel about the number of visits he had with M.L. So without looking beyond his own testimony, the evidence was sufficient to establish by a preponderance of the evidence that Defendant was not always truthful in his dealings with AP&P. Especially given the "zero tolerance" character of Defendant's probation, his admitted lies to AP&P are alone enough to warrant revocation of his probation.

¶11 We will, however, briefly touch upon the other two grounds for revocation, primarily for the guidance our analysis might provide in future cases.[3] As indicated, the district court found that Defendant "dated a person with children residing at home who are under the age of 18."

¶12 At the evidentiary hearing, M.L. testified that Defendant initially contacted her by sending her a "flirt" on a "website for

---

3. In the event a petition for certiorari is filed, the additional discussion might also aid the Utah Supreme Court's decision whether to grant the petition.

LDS singles."[4] From there, Defendant and M.L. began emailing at least every other day, and they eventually started speaking on the phone. The two also met for lunch at two fast food restaurants, a total of four times, over a four-week period. These meetings lasted anywhere from forty-five minutes to two-and-a-half hours. Defendant paid for lunch each time, and at the last lunch, he held M.L.'s hand and put his arm around her. Although M.L. testified that she did not think of Defendant as her boyfriend or of their relationship as "being a romance," when asked if she felt "that this was the beginnings or the very beginnings of a dating relationship," she testified, "I did, yeah. I felt we connected on a lot of levels." In addition, Defendant had told her that he hoped to be exonerated, and she "was just hoping that all this was going to come back and be [found to have been] a lie like he said it was and that he was going to be let go and everything was going to kind of go from there." M.L. also testified that Defendant "brought up marriage a lot." This record evidence is more than sufficient to show by a preponderance of the evidence that Defendant "dated" M.L., as that term is commonly understood.

¶13    Turning to the district court's finding that Defendant failed to complete the NUCCC program, Defendant contends that the district court erred because he "desired to complete NUCCC and the terms of his probation," and thus his expulsion from the program should not be counted against him and, in any case, could not be considered willful. In finding that Defendant failed to complete the NUCCC program, the district court discussed Defendant's lying and the fact that he knew he was meeting with a woman with minor children. The district court also relied on the testimony of Defendant's therapist from

---

4. "LDS" is the acronym for Latter-day Saint and is used in this context as a shorthand reference to members of the Church of Jesus Christ of Latter-day Saints.

NUCCC. The therapist, who acknowledged that Defendant had seemed to be doing well in his program, testified that he was concerned that "a lot of [Defendant's] behaviors and his conduct in the community were kind of the antithesis of what we were seeing in therapy." He also testified that he was particularly concerned that Defendant was telling M.L. that he was not guilty of the charge to which he pled guilty because "[t]his then reflects that he still wasn't taking full accountability for it. He didn't really own the fact that he actually committed this crime or had done something wrong." The therapist was also troubled by Defendant's lying. The therapist ultimately testified that Defendant was no longer an appropriate candidate for NUCCC and that his participation in the program had been ended. This evidence is sufficient to support the district court's determination that Defendant failed to complete his NUCCC treatment program.

¶14 Finally, we turn to Defendant's contention that the district court "never made an express finding that [Defendant] committed a willful violation." This claim is without merit. Although the district court did not use the word "willful" in its findings of fact, we have previously held that a "trial court's finding of willfulness may be implicit rather than explicit." *State v. Robinson*, 2014 UT App 114, ¶ 16, 327 P.3d 589. In this case, the district court explained the evidence it relied on and its reasons for finding that Defendant violated his probation conditions. There is no suggestion that the court considered any of Defendant's misbehavior to be accidental, the product of coercion, or the result of an honest mistake. The district court thus implicitly found that Defendant's violations were willful, i.e., that he "did not make *bona fide* efforts to meet the conditions of his probation." *State v. Peterson*, 869 P.2d 989, 991 (Utah Ct. App. 1994) (citation and internal quotation marks omitted). Viewed in the light most favorable to the district court's findings, the record evidence supports the district court's "implicit finding of willfulness." *See Robinson*, 2014 UT

App 114, ¶ 19. We conclude that the evidence was sufficient to support a finding that Defendant violated the terms of his probation.

¶15    Defendant's second issue on appeal concerns whether the district court erred when it "relied upon information not presented or entered as evidence" in finding that Defendant violated his probation by not being truthful with AP&P and by dating M.L. Specifically, Defendant contends that the district court improperly relied on his emails with M.L. in making these findings.

¶16    At the evidentiary hearing, the court explained the basis for its finding that Defendant and M.L. dated:

> Part of that is that you were not to date a person who had children residing in the home. Well, you met four times. You met anywhere from 45 minutes to three hours by [M.L.'s] testimony. That's more than turning in an application and somebody from Del Taco or Wendy's telling you well we're going to hold that application as you testified. . . .
>
> Furthermore, what shows it was a date? There doesn't have to be sexual contact or kissing or anything like that. It's the time increases with [M.L.] every time you meet with her and then there's physical touching. You held hands. You put your arm around her and by her own testimony it was going further is what she said. And then you bought her meals. Now, if that's not a date I don't know what a date is.

Notably, the court did not refer to the emails as a basis for its finding that Defendant dated M.L. In addition, the court did not

rely on the emails in finding that Defendant was not truthful with AP&P:

> You admitted you lied and you said to protect [her]. That just doesn't make any sense. You were protecting [yourself], trying to and that's why you did [it].

> [T]hey gave you many chances to fess up and it's clear from the testimony of [your therapist] that they gave you those chances. They said you can stay in the program if you'll just tell us the truth and you chose to lie as to the number of times you met with [M.L.] and how long you met with her which required them to go out and spend hours to try to figure this out and so they did. So I'm finding that you have violated and that the State has met its burden concerning, No. 1, that you have failed to be truthful in all your dealings with AP&P on or about July 31st.

Thus, our review of the record indicates that the court did not rely on the emails in finding that Defendant violated the terms of his probation, warranting its revocation.

¶17 In any event, even if the district court did rely on the emails to support its findings, or at least in deciding to reimpose Defendant's prison sentence, it was not necessarily improper. We have previously recognized that "sentencing and probation hearings are relatively informal. Most rules of evidence do not apply." *State v. Hodges*, 798 P.2d 270, 279 (Utah Ct. App. 1990). Indeed, rule 1101 of the Utah Rules of Evidence states that other than the rules regarding privileges, the rules of evidence do not apply to "sentencing, or granting or revoking probation." Utah R. Evid. 1101(c)(3). "While evidence presented at such hearings is certainly subject to challenge on the basis of the traditional reliability concerns underlying evidentiary rules, the overall

informality suggests a standard of proof that is comprehensible and relatively simple." *Hodges*, 798 P.2d at 279. *See also Gagnon v. Scarpelli*, 411 U.S. 778, 782 & n.5 (1973) (stating that courts may rely on "conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence" in deciding whether to revoke probation); *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (stating that in parole and probation revocation proceedings, "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial").

¶18    Here, the emails were attached to AP&P's amended probation violation report, which was submitted with its affidavit in support of an order to show cause. Defendant was not precluded from refuting the emails' accuracy when they were specifically addressed by the district court at the subsequent sentencing hearing, but he chose not to do so—not even in the course of a colloquy directly between Defendant and the court. And he does not explain why, or even assert that, had the emails been proffered as evidence at the earlier evidentiary hearing, they would have been deemed inadmissible. We therefore conclude that no error occurred in connection with any limited consideration the district court may have given the emails.

¶19    Finally, Defendant argues that it was a violation of his due process rights for the district court to accept filings, i.e., the emails, "by non-parties to the legal proceedings." The State contends that Defendant failed to preserve this issue for appeal. "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. The Utah Supreme Court has held that "the preservation rule applies to every claim, including constitutional questions, unless a defendant can demonstrate that 'exceptional circumstances' exist or 'plain error' occurred." *Id.* To preserve an issue for appeal, "the issue must be presented to the trial court in

such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). "Thus, if a party makes an objection . . . based on one ground, this objection does not preserve for appeal any alternative grounds for objection." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867.

¶20    In the district court, counsel objected on the ground that the State did not submit the emails as evidence at the evidentiary hearing. Counsel did not argue that it would violate due process for the district court to consider the emails for the first time at the later sentencing hearing, without their having been entered into evidence. We agree with the State that Defendant's ambiguous objection did not preserve his due process claim for appeal, and Defendant does not argue that his claim falls within an exception to our preservation rule. *See Holgate*, 2000 UT 74, ¶ 11. Accordingly, we decline to address Defendant's due process claim.

¶21    Affirmed.

––––––––––